UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

TTA SERVICES LLC d/b/a
THUNDERBOLT SIGNS

                              CIVIL ACTION

VERSUS

                              NO. 26-370-JWD-RLB

DEEP SOUTH SIGNS LLC,
AND MORGAN DESCANT

## RULING AND ORDER

This matter comes before the Court on the *Motion for Temporary Restraining Order* (Doc. 4) filed by Plaintiff TTA Services LLC d/b/a Thunderbolt Signs ("Plaintiff" or "TTA"). Defendants Deep South Signs, LLC, ("Deep South") and Morgan Descant (collectively, "Defendants") oppose the motion. (Doc. 9.) While Plaintiff has time remaining to file a reply, (Doc. 7), the Court finds that a reply is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, TTA's motion is denied.

## I.   RELEVANT FACTUAL BACKGROUND

### A.  TTA and Morgan Descant

TTA's operations include bidding for the installation of commercial signs for stores and other businesses that utilize national sign companies for the creation and installation of signs for the businesses' new locations as well as replacement of signs at existing locations. (*Compl.* ¶ 10, Doc. 1; *see also id.* at 25 (verifying *Complaint*).) The national sign companies utilize companies like TTA to obtain the necessary permitting for and the construction of pylon signs and building mounted signs where the national sign companies do not have installation crews. (*Id.* ¶ 11.)

Defendant Morgan Descant was the principal of a company named Morgan Signs, LLC ("Morgan Signs"). (*Id.* ¶ 14.) Morgan Signs was in the commercial sign design and installation business. (*Id.*)

In November 2017, TTA and Morgan Signs entered into an agreement under which TTA purchased Morgan Signs' assets. (*Id.* ¶ 15.) The transaction closed March 2018. (*Id.* ¶ 16.) Under the agreement, Descant agreed to remain as a paid consultant to TTA for two years after the sale. (*Id.* ¶ 17.) Descant determined installation methods for numerous jobs, supervised crews, and directed work activities, and he also agreed not to conduct any separate and independent commercial sign operations business for a two-year period. (*Id.* ¶¶ 18–19.) On February 20, 2020—at the expiration of the two-year consultancy period—Descant signed an extension on the agreement not to compete and agreed to stay on as a consultant for two more years. (*Id.* ¶ 20.)

But, without Plaintiff's knowledge, in October 2019, Descant formed the company that would become Deep South, a commercial sign business. (*Id.* ¶ 21.) After litigation in the 19th JDC over the noncompete and other matters, and after settlement of that case in September 2023, TTA and Deep South continued to operate as separate and distinct commercial sign operations. (*Id.* ¶¶ 23–25.)

### B. The Scheme

In May 2025, Plaintiff began to receive information that Descant had embarked on a fraudulent scheme to unfairly compete in the commercial sign installation market in the state of Louisiana and throughout the Gulf South. (*Id.* ¶ 26.) According to Plaintiff, these allegations are distinct from the prior litigation and are ongoing. (*Id.* ¶ 27.)

Shortly after the resolution of the previous litigation, TTA began noticing that the rate of success on bids for installation contracts of several of its primary accounts was becoming less and

less common. (*Id.* ¶ 28.) The decline on these accounts continued through 2024 and into 2025, and in 2025 receipts from nine national sign company accounts, which were believed to be affected by the fraud, were less than 10% of what they had been in 2022. (*Id.* ¶ 29.)

According to the *Complaint*, national sign companies commonly maintain a stable of local installation companies to perform their installations. (*Id.* ¶ 30.) In many cases, one or more project managers employed by each national sign company are responsible for selecting from their stable of local installers in particular geographic areas. (*Id.*) While certain project managers are given some level of discretion in choosing the local installer, a bid process is usually a key feature in the selection. (*Id.* at ¶ 31.)

The *Complaint* asserts that the reason for the decline in national sign company receipts became plain when Plaintiff discovered information that Descant has engaged in a years-long bribery and kickback scheme with at least one project manager with at least one national sign company. (*Id.* ¶ 32.) The employee of one of the national sign companies, referred to in the *Complaint* as Company A, is a project manager in charge of procuring bids for commercial sign installation in the state of Louisiana and throughout the Gulf South. (*Id.* ¶ 33.)

Plaintiff claims that Company A has been a staple of TTA's business from TTA's inception; that Company A and the project manager both reside outside of Louisiana; and that Company A is unaware of the scheme between Descant and the project manager. (*Id.* ¶¶ 34–36.)

Plaintiff claims that Descant pays a portion of the fees from awarded contracts back to the project manager, typically in the amount of 10% of the invoiced amount of a particular project. (*Id.* ¶ 37.) As additional inducement, Descant has provided other goods and services to the project manager. (*Id.* ¶ 38.) Descant has encouraged and the project manager has agreed to send all of Company A's commercial sign installation projects in Louisiana and Mississippi to Deep South.

(*Id.* ¶ 39.) The project manager has also directed projects to Deep South for installations in Alabama and Texas. (*Id.* ¶ 40.)

The project manager has shared competitor pricing with Descant in connection with his preparation of bids. (*Id.* ¶ 41.) The project manager has also educated Descant in the best way to maximize the amount of his bids to the detriment of the national sign company and its own customers, including by inflating the amounts charged relative to permitting, which are elements of an invoice that typically receive little scrutiny. (*Id.* ¶ 42.)

Plaintiff alleges that the scheme continues to this day and involves project managers with up to eight national sign companies. (*Id.* ¶¶ 43–44.) While discovered less than a year ago, the scheme has been ongoing for at least four years, and it is estimated that, for Company A alone, the invoices for the installation services that are part of the bribery and kickback scheme total over $500,000. (*Id.* ¶ 45.)

Moreover, Descant has disparaged Plaintiff and its principals to the project manager in an effort to convince the project manager to stop using Plaintiff. (*Id.* ¶ 46.) Plaintiff had previously been awarded a consistent stream of projects from Company A that began to dwindle once the scheme alleged above began to take root. (*Id.* ¶ 54.)

### C. Relief

Plaintiff asserts that "[i]mmediate injunctive relief is necessary to prevent this fraudulent conduct and level the competitive playing field. Thereafter, Defendants should be held accountable to pay Plaintiff the damages it has sustained." (*Id.* ¶ 4.) Plaintiff brings claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), specifically 18 U.S.C. § 1962(c) and (d), (*id.* ¶¶ 51–79); the Sherman Act, 15 U.S.C. § 1 *et seq.*, (*id.* ¶¶ 80–91); the Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. § 15:1401 *et seq.*, (*id.* ¶¶ 92–100); and Louisiana law for

tortious interference with business relationships, (*id.* ¶¶ 101–06), and "general Louisiana tort liability," (*id.* ¶¶ 107–11).

Plaintiff asserts that it can demonstrate that its receipts from Company A have steadily declined such that, in 2025, receipts from Company A were $0. (*Id.* ¶ 55.) According to Plaintiff, the precipitous decline tracks the scheme by Descant and the project manager of Company A. (*Id.* ¶ 56.) The scheme began in 2023, and Plaintiff's sales to Company A dropped by 69% from 2022 to 2023. Plaintiff's sales to Company A dropped 94% from 2022 to 2024. (*Id.* ¶ 58.) Plaintiff suffered lost profits, loss of business opportunities, reputational harm, and other damages exceeding $800,000. (*Id.* ¶ 63.)

## II.    RELEVANT STANDARD

Federal Rule of Civil Procedure 65 provides:

> The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1).

The four requirements for a temporary restraining order are the same for a preliminary injunction: "the plaintiff must show 1) that there is a substantial likelihood that it will succeed on the merits, 2) that there is a substantial threat that it will suffer irreparable injury if the district court does not grant the injunction, 3) that the threatened injury to the plaintiff outweighs the threatened injury to the defendant, and 4) that granting the preliminary injunction will not disserve the public interest." *W. Sur. Co. v. PASI of LA, Inc.*, 334 F. Supp. 3d 764, 789 (M.D. La. 2018) (deGravelles, J.) (citing *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993)); *see also*

*June Med. Servs., LLC v. Caldwell*, No. 14-525, 2014 WL 4296679, at *5 (M.D. La. Aug. 31, 2014) (deGravelles, J.) (describing four requirements for temporary restraining order (citations omitted)), *abrogated on other grounds Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), *as recognized by June Med. Servs. LLC v. Phillips*, 640 F. Supp. 3d 523 (M.D. La. 2022) (deGravelles, J.).

"Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *PASI*, 334 F. Supp. 3d at 789–90 n.201 (citing *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). "Otherwise stated, if a party fails to meet *any* of the four requirements, the court cannot grant the temporary restraining order or preliminary injunction." *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2006) (emphasis in original) (quoted with approval by *PASI*, 334 F. Supp. 3d at 790).

## III.  DISCUSSION

### A.  Plaintiff's Arguments

The Court finds that this motion turns on one element—the alleged substantial threat of irreparable injury—so that is where the Court will focus its attention. Plaintiff acknowledges that "established law discourages granting an injunction where monetary damages can compensate for the loss," but TTA argues that this barrier is not "insurmountable." (Doc. 4-1 at 14.) Plaintiff cites authority for the proposition that it can establish irreparable injury through proof of the potential loss of its business and clients. (*Id.* at 14–15.) Plaintiff also asserts that future RICO violations can be enjoined. (*Id.* at 15.)

Defendants oppose the motion. (Doc. 9.) Defendants argue that: (1) Plaintiff's alleged harms are monetary and can be undone through monetary damages, (*id.* at 8–9); (2) Plaintiff has

not pled or declared in its motion that Plaintiff's goodwill has been or will be harmed or that its operations will cease, (*id.* at 9–10); and (3) Plaintiff's delay in filing suit shows no immediate and irreparable harm, (*id.* at 10–12).

### B.  Good Will and Lost Profits

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2948.1 (3d ed. 2026). "Irreparable injury is harm that 'cannot be undone through monetary damages,' that is, harm for which money damages are inadequate or for which money damages are 'especially difficult' to compute." *Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 619 (W.D. La. 2010) (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir.1989)). "The 'central inquiry in deciding whether there is a substantial threat of irreparable harm to the plaintiff is whether the plaintiff's injury could be compensated by money damages.'" *Id.* (quoting *Allied Mktg. Grp.*, 878 F.2d at 810 n.1). Accordingly, "there can be no irreparable injury where money damages would adequately compensate a plaintiff." *Id.* (citing *DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990) (per curiam) (citations omitted)).

This is not, however, an absolute rule. "Where economic rights are involved, irreparable harm exists 'when the nature of those rights makes establishment of the dollar value of the loss . . . especially difficult or speculative." *Id.* at 626 (citing *Allied Mktg. Grp.*, 878 F.2d at 810; *Block Corp. v. Nunez*, No. 08-53, 2008 WL 1884012, *6 (N.D. Miss. Apr. 25, 2008)). But "[w]hile a loss of a business' customers and damage to its goodwill are widely recognized as injuries incapable

of ascertainment in monetary terms and may thus be irreparable," *id.* (citation omitted), a plaintiff fails to meet its burden when it "specifically allege[s] the exact amount of profits it lost as a result of the" defendant's misconduct, *see id.* (finding when plaintiff did so that "these damages [were] not incalculable or speculative"). Thus, "simply arguing that a company is losing customers and goodwill without showing that monetary damages are an inadequate remedy is insufficient to establish irreparable harm." *Id.* at 620 (citing *Millennium Rests. Grp. v. City of Dallas*, 181 F. Supp. 2d 659, 666 (N.D. Tex. 2001); *Sun Water Sys., Inc. v. Vitasalus, Inc.*, No. 05-574, 2007 WL 820280, *6 (N.D. Tex. Mar. 8, 2007)).

Plaintiff fails to meet its burden of showing irreparable harm. Plaintiff provides an unsworn declaration of Euguene F. Bagot III, TTA's President, who swears that, since he "became aware of Descant's scheme, TTA has monitored its revenue from the company that employs Descant's co-conspirator as well as its revenues from other national sign installation companies." (Bagot Decl. ¶¶ 1, 16, Doc. 4-2.) Bagot says that, "[s]ince [he] became aware of Descant's scheme, TTA's revenues from national sign installation companies have drastically declined." (*Id.* ¶ 17.) Dona Bagot handles TTA's accounting, and she avers that, "[i]n the three year span of the communications, data show bids rigged for just Company A exceed $500,000." (D. Bagot Decl. ¶¶ 2, 28, Doc. 4-3.) The verified *Complaint* likewise states that "the scheme has been ongoing for at least 4 years and it is estimated that for Company A alone, the value of the invoices for the installation services that are part of the bribery and kickback scheme total over $500,000." (*Compl.* ¶ 45, Doc. 1.) The *Complaint* later states that "Plaintiff can demonstrate that its receipts from Company A have steadily declined such that in 2025 receipts from Company A were $0" and that "Plaintiff's sales to Company A from 2022 to 2024 reflect a drop of 94%." (*Id.* ¶¶ 55, 58.) Plaintiff

8

pleads that it "suffered lost profits, loss of business opportunities, reputational harm, and other damages exceeding $800,000." (*Id.* ¶ 63.)

Thus, the verified *Complaint* and other evidence reflect that TTA can demonstrate with considerable precision the lost profits it suffered as a result of the fraudulent scheme. Such losses are not speculative or difficult to calculate, so Plaintiff is not entitled to injunctive relief. *See Johnson*, 724 F. Supp. 2d at 626.

Similarly, with respect to the loss of goodwill, the *Complaint* alleges that Descant has disparaged Plaintiff and its principals to the project manager in an effort to convince the project manager stop using Plaintiff. (*Id.* ¶ 46.) Plaintiff had previously been awarded a consistent stream of projects from Company A that began to dwindle once the scheme alleged above began to take root. (*Id.* ¶ 54.) But, again, "simply arguing that a company is losing customers and goodwill without showing that monetary damages are inadequate is insufficient to establish irreparable harm as required for injunctive relief." *Johnson*, 724 F. Supp. at 626. Without more, Plaintiff cannot meet its burden of proving irreparable harm.

Even if Plaintiff had shown that its damages could not be easily calculated, Plaintiff fails to demonstrate irreparable harm for an additional reason: Such a showing must be supported with sufficient proof. The above allegations lack any documentation to support their conclusions. *See The Boil & Roux Kitchen, LLC v. East Baton Rouge Off. of Alcohol Beverage Control*, No. 23-409, 2023 WL 4041894, at *1 (M.D. La. May 31, 2023) (Dick, C.J.) ("[T]he Court denies Plaintiff's Motion for TRO because the pleadings are devoid of any factually supported allegations of any immediate or irreparable injury, loss, or damage that may result before the parties may be heard on a preliminary injunction. . . . Plaintiff makes the conclusory allegation of irreparable injury in the form of 'loss of profits and reputational damage.'"). Plaintiff submits nearly 150 pages

9

of text messages which purportedly establish the kickback scheme, (*see* D. Bagot Decl. Exs. 2-A & 2-B, Doc. 4-3 at 7–147), but Plaintiff fails to provide a single pinpoint citation to any of these texts, referring instead to the exhibits *in globo*. This is insufficient to support Plaintiff's position. *Cf. Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)) (citing *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (noting that it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"); and then citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."))).

Ultimately, without more, TTA's "damage, if any, does not rise to the irreparable harm level necessary for the extraordinary relief of a preliminary injunction." *Johnson*, 724 F. Supp. 2d at 627. Plaintiff must therefore satisfy this element a different way.

### C. Injunctive Relief and RICO

Plaintiff also claims that it has demonstrated irreparable harm by virtue of its RICO claim. According to Plaintiff, "§ 1964 allows for future RICO violations to be enjoined." (Doc. 4-1 at 15.) But the issue is not as clearcut as Plaintiff would like. As the Fourth Circuit recently observed:

> Our sister circuits are evenly divided on this question, which presents an issue of first impression for our Court. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 138–139 (2d Cir. 2016) (holding that equitable relief is available); *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 697 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 [ ] (2003) (same); *Dixie Carriers, Inc. v. Channel Fueling Serv., Inc.*, 843 F.2d 821, 829–830 (5th Cir. 1988) (holding that equitable relief is not available); *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1084 (9th Cir. 1986) (same).

*Hengle v. Treppa*, 19 F.4th 324, 353 (4th Cir. 2021).

Indeed, the state of the law is even more ambiguous in the Fifth than *Hengle* indicates. "The appellate courts of the United States have expressed considerable doubt over whether injunctive relief is even available to private plaintiffs under RICO." *Hinojosa v. City of Kingsville*, 266 F. Supp. 2d 562, 564–65 (S.D. Tex. 2003) (citing *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970, 977 n.42 (5th Cir. 2000) (noting that "there is considerable doubt that injunctive relief is available to private plaintiffs under RICO . . . . The only court of appeals case to address the issue has held that RICO does not allow private injunctive relief . . . and we have agreed in dicta") (citing *Conkling v. Turner*, 18 F.3d 1285, 1296 n.8 (5th Cir. 1994); and then citing *Wollersheim*, 796 F.2d at 1082–89; and then citing *In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir. 1988); and then comparing *Scheidler*, 267 F.3d 687 (7th Cir. 2001) (finding that RICO civil remedies provision authorizes injunctive relief at the behest of private plaintiffs))). In *Richard v. Hoechst Celanese Chem. Grp., Inc.*, 355 F.3d 345, 354–55 (5th Cir. 2003), the Fifth Circuit expressed some agreement with the Second Circuit but only after stating: "This Court has not decided whether equitable relief is available to a private civil RICO plaintiff. The circumstances before us do not necessitate that we reach this question today." *Id.* at 354–55 (internal citation omitted); *see also Cunningham v. Offshore Specialty Fabrications, Inc.*, 543 F. Supp. 2d 614, 640–41 (E.D. Tex. 2008), *aff'd sub nom.*, *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759 (5th Cir. 2011) (citing *Richard* for the proposition that the "Fifth Circuit came close to recognizing some form of equitable relief in accepting the Second Circuit's view"). Thus, any such leaning in *Richard* was dicta. *See Richard*, 355 F.3d at 354–55 ("Even if equitable relief were available to a private party, disgorgement is not a proper remedy given the circumstances present in this case."). Ultimately, the issue remains unresolved. *See Cunningham*, 543 F. Supp. 2d at 640 ("The cases cited by both

11

parties are in agreement that the Fifth Circuit has not decided whether equitable relief is available for private civil RICO plaintiffs under 18 U.S.C. § 1964(a)–(c).").

Left with no clear answer, this Court is inclined to adopt the position of the Fourth Circuit, which held that "Section 1964 does not authorize private RICO plaintiffs to sue for prospective injunctive relief" because "the text of Section 1964 is unambiguous and the statutory scheme is coherent and consistent." *Hengle*, 19 F.4th at 356 (cleaned up); *see also id.* at 353–56 (analyzing the statute). This position is most in line with basic principles of statutory interpretation. *See id.* at 356 (citing *Alexander v. Sandoval*, 532 U.S. 275, 288 n.7 (2001) ("[T]he interpretive inquiry begins with the text and structure of the statute and ends once it has become clear that Congress did not provide a cause of action." (internal citation omitted))).

Nevertheless, this Court need not make this determination. Again, "a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *PASI*, 334 F. Supp. 3d at 789–90 (cleaned up). Given the uncertainty in the law—both outside this circuit and within it—the Court cannot say that Plaintiff has "clearly" demonstrated entitlement to injunctive relief. With no other showing of irreparable harm, Plaintiff's motion must be denied.

### D. Delay in Filing Suit

As this Court explained in *Walker v. National Collegiate Athletic Ass'n*, No. 25-514, 2025 WL 1901907 (M.D. La. July 1, 2025) (deGravelles, J.):

> Again, to obtain a preliminary injunction, Plaintiff must establish, *inter alia*, "that there is a substantial threat that it will suffer irreparable injury if the district court does not grant the injunction[.]" *PASI*, 334 F. Supp. 3d at 789 (citation omitted). Under this requirement, "[t]he law is well-established that:"
>
> > [D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction.

> Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.

*Id.* at 799 (quoting *Gonannies*, 464 F.Supp.2d at 609). "Wright and Miller similarly recognizes: 'A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.'" *Id.* (quoting 11A Charles A. Wright, Arthur R. Miller, et al., *Federal Practice and Procedure*, § 2948.1 (3d ed. 2018)).

> Unlike a defense based upon the statute of limitations, mere delay is not sufficient to bar injunctive relief on the ground of laches. . . . Delay coupled with knowledge and acquiescence in the acts complained of, as well as prejudice to defendant generally will be a sufficient basis for denying injunctive relief. . . . The defense of laches is equitable in nature and the court must look at all the factors or circumstances relevant to a given case when deciding whether relief should be barred. Thus, a lapse of time because of plaintiff's ignorance of his rights or his disability or in some situations, even neglect, when it is not attributable to a lack of diligence, should not bar the issuance of an injunction.

*Id.* (quoting Wright & Miller, *supra*, at § 2946).

Nevertheless, this Court has recognized that delays of only a few months can warrant denying a motion for preliminary injunction. *See also Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, No. 18-23, 2019 WL 491312, at *2 (M.D. La. Feb. 7, 2019) (Dick, C.J.) (citing *Gonannies*, 464 F. Supp. 2d at 609) (citing *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995) (vacating preliminary injunction where movant waited four (4) months to seek a preliminary injunction after filing suit); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (ten (10) week delay in seeking injunction for trademark infringement undercut claim of irreparable harm); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming district court's denial of temporary injunctive relief where movant, among other things, delayed three (3) months in making its request) (descriptions of authority quoted from *Gonannies*))). Indeed, excessive delay can be found even where a plaintiff is trying to resolve the situation amicably. *See*

> *Gonannies*, 464 F. Supp. 2d at 609 (noting that six-month delay in filing motion from discovery of infringing conduct was not justified, even when plaintiff filed the motion "only after settlement negotiations had soured.").

*Id.* at *5–6.

Here, the verified *Complaint* states that, "[i]n May of 2025, Plaintiff began to receive information that Descant had embarked on a fraudulent scheme to unfairly compete in the commercial sign installation market in the state of Louisiana and throughout the Gulf South." (*Compl.* ¶ 26, Doc. 1.) Despite this, Plaintiff did not file suit and seek injunctive relief until nearly one year later, in April of 2026. Clearly, "such delay militates against a finding of irreparable harm under the above authorities." *Walker*, 2025 WL 1901907, at *7 (citing *Atchafalaya Basinkeeper*, 2019 WL 491312, at *2 (collecting cases)). "At the very least, Plaintiff has not 'clearly carried' his burden of showing irreparable harm." *Id.* (quoting *PASI*, 335 F. Supp. 3d at 789–90 (citation omitted)). And "though delays can be justified with 'a good explanation,' *see* PASI., 334 F. Supp. 3d at 799, here, Plaintiff has none." *Id.*

In sum, the Court finds that Plaintiff's "delay was excessively long and unjustified." *Id.* For that additional reason, Plaintiff's motion is denied.

**[*continued on next page*]**

14

**IV.**     **CONCLUSION**

Accordingly,

**IT IS ORDERED** that the *Motion for Temporary Restraining Order* (Doc. 4) filed by Plaintiff TTA Services LLC d/b/a Thunderbolt Signs is **DENIED**.

**IT IS FURTHER ORDERED** that, within seven (7) days of this ruling, the parties file simultaneous briefs, not to exceed five (5) pages, addressing why the *Motion for Preliminary Injunction* should not be denied for the same reasons given in this ruling.

**IT IS FURTHER ORDERED** that the Tuesday, April 28, 2026, status conference is **RESET** to May 5, 2026, at 2:00 p.m. The conference shall take place by Zoom video conference.

Signed in Baton Rouge, Louisiana, on April 21, 2026.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**